IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MIDLAND FUNDING LLC,

                            Plaintiff,                    Case No. 3:08 CV 1434

        -vs-

                                                <u>MEMORANDUM   OPINION</u>

ANDREA L. BRENT,

                           Defendant.

KATZ, J.

This matter is before the Court on two competing motions for summary judgment: (1) a motion for summary judgment filed by Defendant and Counterclaim  Plaintiff Andrea Brent ("Brent") (Doc. 34) and (2) a motion for summary judgment filed jointly by original Plaintiff Midland Funding LLC ("Midland") and Counterclaim Defendant Midland Credit Management, Inc. ("MCM") (Doc. 35).  Midland and MCM jointly filed a response opposing Brent's motion for summary judgment (Doc. 41).  Brent filed a response opposing Midland and MCM's motion for summary judgment (Doc. 40).  Both parties have filed replies in defense of their own motions for summary judgment (Docs. 42, 43).  Midland and MCM filed a supplemental brief citing new authority (Doc. 47) and Brent responded to that brief (Doc. 48).

For the reasons stated herein, the Court finds the following: (1) Midland and MCM violated the Fair Debt Collection Protection Act (FDCPA) by attempting to collect a debt with a false affidavit; (2) there is a question of material fact as to whether Midland and MCM violated the FDCPA by attempting to collect interest at a higher rate than allowed by law; (3) Midland and MCM violated the Ohio Consumer Sales Protection Act (OCSPA) by attempting to collect a debt with a false affidavit; (4) there is a question of material fact as to whether Midland and MCM violated the OCSPA by attempting to collect interest at a higher rate than allowed by law;  (5)

Brent is not entitled to declaratory judgment or injunctive relief for the violations of the FDCPA;

and (6)  Brent is entitled to declaratory judgment and injunctive relief for the violations of the

OCSPA.

Thus, Midland and MCM's motion for summary judgment (Doc. 35) is denied.  Brent's

motion for summary judgment (Doc. 34) is granted in part and denied in part.  Further, Midland

and MCM are enjoined under the OCSPA from using false affidavits in their attempts to collect

debts.

## I.  BACKGROUND

Midland and its affiliated companies are in the business of purchasing written-off debt

from credit-issuers and then pursuing collection of that debt in a variety of manners.  The

particular debt in question here is a credit card balance of $4,516.57 allegedly owed by Brent to a

credit card issuer.  The original credit card was issued by Associates National Bank

("Associates"), and then Citibank USA ("Citibank")[1] succeeded Associates in its interest.  MCM,

a company closely affiliated with Midland, purchased this debt from Citibank.

After MCM purchased the debt, MCM employed Midland to pursue collection of the

amount owed on the card.  MCM attempted to collect the debt by trying, unsuccessfully, to

contact Brent by mail and phone.  Next, MCM referred the matter to the law firm of Javitch, Block

& Rathbone LLP ("JBR"), who, on April 17, 2008, filed a complaint against Brent in the

Sandusky, Ohio Municipal Court to recover the amounts unpaid on the credit card.

---

[1] Citibank USA is also known in correspondence as CITIBANK USA, Citi, Citibank, N.A., Citibank (South Dakota), N.A., and Citibank USA, National Association.  Because the difference in theses names and entities does not impact this decision, the Court will refer to them collectively as "Citibank."

Brent answered, denying the obligation to Citibank and Midland.  She also counter-claimed against Midland for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a *et seq.* ("FDCPA") and a state-law tort claim of intentional and/or negligent infliction of emotional distress.  Brent also included MCM as a counterclaim defendant since MCM is the owner of the debt and contracted with Midland to collect it.

Brent requested that the Court certify two classes of similarly-situated people who have been subject to collection lawsuits filed by Midland.  The first requested class is people who have been sued by Midland where a form affidavit was attached to the complaint.  The second requested class is people who were sued by Midland beyond the statute of limitations.  (Doc. 1 at 6).  (*See also* Doc. 14, Motion for Class Certification filed by Brent on August 19, 2008).

On receipt of the counter-claim, Counterclaim Defendant Midland removed to the Northern District of Ohio, citing jurisdiction due to the counter-claim falling under a federal statute (namely, the FDCPA).  (Doc. 1).  MCM consented to the removal, and Brent did not object, making the removal proper.

On December 1, 2008 Brent filed an amended counterclaim against Midland and MCM. (Doc. 22).  The amended counterclaim does four things:  (1) refines the language of the FDCPA violation claims, (2) removes the tort-based negligent and/or intentional infliction of emotional distress claim, (3) adds a claim alleging violation of the Ohio Consumer Sales Protection Act, Ohio Rev. Code Ann. § 1345 *et seq.* (2008) ("OCSPA"), and (4) modifies the requested class certification to now include three classes.

Both parties have filed motions for summary judgment on the issues of the FDCPA and the OCSPA claims, which are before this Court now for decision.  Importantly, the matter of the validity of the original debt is not at issue before this Court.

On March 31, 2009, this Court denied the motion for class certification with leave to refile after ruling on the dispositive motions.  (Doc. 44).

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The Court views the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).  The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S.

at 586.  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324; *see also Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir. 2006); *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071; *Bultema v. United States*, 359 F.3d 379, 382 (6th Cir. 2004). The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried."  *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. DISCUSSION**

The Fair Debt Collection Act, passed in 1978, was seen as a solution to "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices" and inadequate current laws.  15 U.S.C. § 1692 (a), (b).  Taken broadly, the act regulates the conduct of debt collectors and provides consumer protection, including a private right of action against debt collectors who violate the act.  § 1692k.  Section 1692e provides that "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Section 1692f prohibits the use of "unfair or unconscionable means to collect or attempt to collect any debt."

The Ohio Consumer Sales Protection Act, first adopted by the state in 1980, provides for a significantly wider set of protections for consumers.  Ohio Rev. Code Ann. § 1345.01 *et seq*.  The act regulates suppliers in all sorts of consumer transactions, but has been widely held to include debt collection because of the language indicating it regulates violations that occur "before, during, *or after the transaction*."  § 1345.02 (emphasis added).

Brent alleges that a number of different acts committed by Midland and MCM violate both the FDCPA and the OCSPA.  In particular, Brent asserts that Midland and MCM used a false affidavit to collect a debt and attempted to charge an interest rate higher than is allowable under law.  She claims that each of these actions violates both the FDCPA and OCSPA.

**A. FDCPA § 1692e**

Brent asserts that the use of the Jimenez affidavit violates section 1692e of the FDCPA. To determine this, the Court must examine: (1) whether the affidavit is a communication in connection with an attempt to collect a debt; (2) whether the communication was, as a matter of fact, false, deceptive, or misleading; (3) whether the falsehood was material; and (4) whether the

6

debt collector is not liable because of the bona fide error standard.   § 1692e.

## 1.   Communication in connection with an attempt to collect a debt

The Sixth Circuit has asserted that affidavits attached to complaints for money do themselves constitute communication for the purposes of the FDCPA.   *See, e.g., Gionis v. Javitch, Block, Rathbone, LLP*, 238 F. App'x 24, 27-30 (6th Cir. 2007) (holding that threats and statements made in an affidavit attached to a complaint could violate the FDCPA).   Therefore, this Court evaluates the statements contained in the affidavit the same as any other correspondence or communication from a debt collector, and holds those statements to the requirement that they not be false or misleading.

## 2.  False, deceptive, or misleading communication

The FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  FDCPA § 1692e.  Specifically at issue here is the prohibition of  "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."  § 1692e(10).  Section 1692k of the statute provides for a remedy of either actual damages or strict liability, which allows consumers to recover statutory damages for violations of the act without proving actual damages suffered.  *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 592 (6th Cir. 2009);  FDCPA 1692k. Debt collectors, as explained *infra* IV.A.4., are afforded a defense of bona fide error if they can show the violation happened without intent to mislead and procedures have been adopted to avoid errors.  FDCPA § 1692k(c).

The Sixth Circuit has determined that debt collector communications are evaluated under the FDCPA according to the "least sophisticated consumer" standard.  *Kistner v. Law Offices of*

*Michael P. Margelefsky, LLC*, 518 F.3d 433, 438 (6th Cir. 2008) (quoting *Lewis v. ACB Bus.*

*Servs., Inc.*, 135 F.3d 389, 400 (6th Cir. 1998)).  This standard "protects naive consumers [while]

prevent[ing] liability for bizarre or idiosyncratic interpretations of collection notices by preserving

a quotient of reasonableness and presuming a basic level of understanding and willingness to read

with care." *Kistner* 518 F.3d at 438-39 (quoting *Fed. Home Loan Mortgage Corp. v. Lamar*, 503

F.3d 504, 509-10 (6th Cir.2007)). While protecting consumers, the standard also affords the debt

collector the easiest and most logical reading of the communication.  The court "will not

'countenance lawsuits based on frivolous misinterpretations or nonsensical interpretations of

being led astray.'" *Lamar*, 503 F.3d at 514 (quoting *Jacobson v. Healthcare Fin. Servs. Inc.*, 434

F.Supp.2d 133 (E.D.N.Y.2006)).

Upon purchasing the Brent debt along with a package of other unpaid credit card balances

from Citibank, Midland began to attempt to collect the debt.  After receiving no response to two

dunning letters, Midland decided that the most effective way to collect the unpaid debt was to file

suit.  Midland had an existing relationship with JBR that defined a number of things, including

how JBR would be paid, and how JBR could request supporting documentation.  According to

that relationship, JBR requested an affidavit to support the Brent debt using the Midland "You've

Got Claims" computer system, which is a system that allows attorneys like JBR to log on and

request certain supporting documentation be generated.

Whether through the "You've Got Claims" system or otherwise, Midland receives and

fulfills about 200 to 400 requests for affidavits per day.  Ivan Jimenez, one of Midland's ten

"specialists" in the department that supports law firms, personally signs between 200 and 400 of

such affidavits per day.  (Ivan Jimenez Dep., Doc. 35, Ex. E at 15).  He finds the stack on a

printer, signs them, and sends them by internal mail to the notary.  (*Id.* at 16-17 ("Q:  Where do your affidavits come from?  A:  As far as what I deal with, they just come from the printer as far as where we get them")).  Mr. Jimenez has the ability to check the accuracy of the information on the affidavit via the computer system and he does, but the percentage of those that are checked for accuracy is "very few and far between."  (*Id.* at 24).

Then, after receipt of the signed affidavit from Midland, JBR attached it to the complaint filed in Sandusky, Ohio Municipal Court.  When the affidavit is compared to the deposition of the affiant, Ivan Jimenez, it is apparent that the affidavit itself contains many falsehoods.

In paragraph 1, the affidavit reads "…I make the statements herein based upon my personal knowledge."  It is apparent from the Jimenez deposition that Mr. Jimenez actually had no personal knowledge of Ms. Brent or her account.  For instance, while Mr. Jimenez is assigned to support and work with ten law firms, JBR is not one of them, leading to the logical conclusion that he would not have personal knowledge of any matter they were handling.  (Jimenez Dep., Doc. 35, Ex. E at 7-8; *Id.* at 16).  It appears to be an entirely random act that he signed this affidavit: he was the signer based entirely on when it came off the printer rather than based on his personal knowledge of Ms. Brent or her account.  (*Id.* at 16-17).  Mr. Jimenez never had any contact with Ms. Brent at all, leading to a logical conclusion that he could not have had the "personal knowledge" claimed in paragraph 1.  *See Id.* at 25-26 ("Q:  Did you ever have any contact with Ms. Brent, any business contacts at all?  A:  I did not personally.").

In paragraph two of the affidavit, the affiant states:

> … I have personal knowledge of all relevant financial information concerning
> Midland Credit Management Inc.'s  account  number 8524186453, which includes
> the following information:  that the defendant did fail to make payments on the

account and that demand has been made for defendant to make payment of the
balance owing on the account described above more than thirty (30) days prior to
making this affidavit; that the attorneys representing the plaintiff Midland Funding
LLC were retained on Midland Funding LLC (sic) behalf by me or persons
reporting to me for the purpose of collecting the delinquent debt owed on the
defendant's account number set out above; and that there was due and owing to
Midland Funding LLC the sum of $4,516.57.

(Jimenez Aff. ¶ 2).  As is evident in the discussion *supra* regarding paragraph one of the affidavit,

Mr. Jimenez has no personal knowledge about the Brent account.  He was not familiar with this

account, did not know the last time a payment was made and did not know the outstanding

balance.  The paragraph also represents that the law firm, JBR, was hired by Mr. Jimenez or one

of his employees.  However, the following exchange during the deposition makes clear this is not

true:

Q:   So were you aware when you signed this affidavit that it was going to be
     used as part of a collection action in a lawsuit?
A:   I was not.
Q:   Are you aware of any other reasons that affidavits are completed, except for
     the collection actions that are filed in the courts?
A:   I wouldn't know what the firm uses the affidavits for.
Q:   So you simply sign them?
A:   Yes.
Q:   You work for Midland Credit Management; correct?
A:   Yes.
Q    This affidavit lists at the top as a plaintiff, Midland Funding, LLC.  What's
     the relationship between Midland Credit Management and Midland Funding
     LLC?
A:   I wouldn't be the best person to ask that question.  I don't know.
Q    Okay.  If you look at paragraph 2, four lines from the bottom of paragraph
     2, you're attesting to the fact, "that the attorneys representing Plaintiff
     Midland Funding LLC were retained on Midland Funding LLC behalf by
     me or persons reporting to me for the purpose of collecting the delinquent
     debt."  Is that what it says?  Did I read that correctly?
A    Yes
Q    When did you retain the attorneys representing Midland Funding LLC?
A    I don't know when the people in my department retained the attorneys.
Q    Did you personally retain the attorneys?

10

A    I did not.

Q    Which persons in your department did retain the attorneys?

A    I wouldn't know specifically.

Q    Are these – how many people do you have reporting to you?

A    I have zero.

Q    Do you know the names of any persons in your department or any persons in Midland Credit who actually do have the responsibility of retaining attorneys?

A    I don't know who in my department would do that.

Q    Would there be someone from another department that would do that?

A    I wouldn't know.

(Jimenez Dep. at 19-21). Thus, there are two patently false claims within paragraph two: first that Mr. Jimenez had any personal knowledge regarding Ms. Brent's debt, and second, that Mr. Jimenez was involved with the decision or act of hiring JBR to pursue legal action.

Paragraph three describes how Midland acquired the debt from Citibank, and if it is read alone, it only states a fact that is very likely true. However, when read in conjunction with paragraph one ("I make the statements herein based upon my personal knowledge"), it is apparently false. The issue of the affiant's knowledge was raised in the deposition:

Q    Well, it says in this affidavit that, in number 3, "That Plaintiff's predecessor in interest sold and assigned all right, title, and interest in this account to the plaintiff." So if it was sold to the plaintiff, my assumption is it was purchased by the plaintiff. And the question I have is, did you have any role or were you involved in any way, shape, or form in the purchase of this account?

A    I was not.

Q    Do you know anything about the terms of the purchase of this account?

A    I do not.

(Jimenez Dep. at 21-22). Thus, the statement in paragraph three, however true or not, cannot be based on personal knowledge.

Paragraph five is also of concern. It asserts that Ms. Brent is neither a minor nor mentally incapacitated, which are facts that are probably true. However, the affiant bases those conclusions

11

"upon business dealings with the defendant(s)," which is clearly not possible since he had no

contact with Ms. Brent.  *See supra*.

      If this is not enough, the affidavit is improperly sworn, as evidenced by the deposition:

Q      You mentioned earlier, when I asked you about that, you signed these affidavits and
        had them notarized.  Was the notary present in the room when you were signing all the
        affidavits, or do you sign them and give them to the notary?
A      I sign them and give them to the notary.

(Jimenez Dep. at 15).  Minnesota Revised Code requires that "an oath . . . shall be administered . .

. [t]o affiants[.]"  Minn. Stat. Ann. § 358.07 (West 2004).

      In finding assertions in the affidavit to be false and misleading, this Court is not

concluding that all the information in the affidavit is incorrect.  Brent has provided no evidence

that the amount of the debt, the fact that it is unpaid, or other vital account information, is false.

As discussed *infra*, the actual account information is probably either correct or likely thought

correct in good faith by Midland and MCM (and likely a *bona fide* error if so).

      However, this Court finds that the affidavit as a whole is both false and misleading for the

aforementioned reasons and notwithstanding the fact that some of the data in it are correct.  It is

unclear to this Court why such a patently false affidavit would be the standard form used at a

business that specialized in the legal ramifications of debt collection.  Midland, MCM, or JBR

could easily prepare a form affidavit that achieved the same goals without being misleading by

reflecting the truth, plain and simple.  Rather than basing the affidavit on false personal

knowledge, they could base it on the accuracy of the records kept and the accuracy of the data.

### 3. Materiality

      In a recent opinion, the Sixth Circuit held that "[a] statement cannot mislead unless it is

material, so a false but non-material statement is not actionable." *Miller v. Javitch, Block and Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009) (quoting *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 758 (7th Cir. 2009)). Both *Miller* and *Hahn* allow for a statement to be "false in some technical sense" but still not in violation of the FDCPA. *Miller*, 561 F.3d at 596 (quoting *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 646 (7th Cir.2009)); *Hahn*, 557 F.3d at 758.

Generally, material facts are ones which, if known, might influence a person's decision on a matter. *See generally* Black's Law Dictionary 998 (8th ed. 2004) (defining material as "[h]aving some logical connection with the consequential facts [or] [o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential[.]"). Thus, the Court evaluates statements for materiality by considering whether they make the proposed assertion more or less likely.

In general, a complaint and attached affidavit act as both a message to the court and a message to the debtor.[2] While the creditor seeks different action from either audience (payment from the debtor as opposed to judgment from the court), the general assertions are the same: that the debt is valid, that there is a total amount, that it is delinquent, that it is subject to interest, and that it is now due and owing. Therefore, a statement or claim based on an affidavit would be material if it makes one of those listed assertions more or less likely than if that fact were not considered.

---

[2]  The Jimenez affidavit filed and attached to Midland's complaint against Brent sought to assert: that the debt was valid (i.e. she once owed it to Citibank and Midland is a successor in that interest), that the amount owed is $4,516.57, that a payment hasn't been made since November, 2000 (i.e. that the account is delinquent), that the unpaid balance is subject to interest of 8%, and that the amount is currently due and owing.

It is unsurprising when a consumer/debtor contacted by a collection agency about a seven-year-old debt would question whether it was a valid obligation.  Ms. Brent instantly questioned the validity of the debt.  Both the complaint and Jimenez affidavit refer to the debt being owed to "CITIBANK USA," and in her answer, Brent "denies that she originally owed any claim to CITIBANK USA at any time."  (Doc. 2 at ¶ 1; *See also* Brent Dep., Doc. 35, Ex. F at 26 (wherein Ms. Brent asserts "[t]o my knowledge, I've never had a CitiBank USA.")).  Thus, Ms. Brent clearly questions the validity of the debt.  To further add confusion to this particular case, investigation reveals that the debt was originally owed to "Associates," and was acquired by Citibank before it was acquired by Midland years later.  Since neither the complaint nor affidavit mention "Associates" in any form, it would be extremely plausible for Ms. Brent to doubt the validity of this debt.

The claims within the Jimenez affidavit that this Court finds to be false are materially related to supporting the proposition of whether the debt is valid.  The affidavit states that the affiant personally knows that this debt is valid, that he personally has "business dealings with the defendant(s)," and specifically that he has personal knowledge of this particular account.  These statements are material to the issue of whether the debt is valid at all, and if relied on, help to make the proposition that it is more likely valid than it was without the statements.

Considering public policy, it is also worth noting many debt collection cases of these types place courts in the position of evaluating the validity of the plaintiff's claim without any response from the defendant.  Thus, in general terms, courts rely on the assertions in an affidavit to determine, among other things, whether the debt is valid and judgment, usually default judgment, should be granted.

This case, then, is distinguishable from those with immaterial falsehoods.  In *Miller*, the Sixth Circuit determined that the difference between suing "for money loaned" rather than specifying that it was for an unpaid credit card debt did not amount to a violation of the FDCPA. *Miller v. Javitch, Block & Rathbone*, 561 F. 3d 588 (6th Cir. 2009).  Miller admitted "that she 'pretty much' understood [the complaint]" when she received it as being an attempt to collect on a credit card that she stopped paying.  *Id.* at 591.  She was aware of the credit card and recalled that she stopped paying on it.  *Id.* at 590.

By contrast, in the case at the bar, Brent claims that she was not aware of any obligation owed to Citibank.  Upon receiving the Midland complaint and attached Jimenez affidavit, she had to evaluate whether the debt being sued on was a valid one.  The contents of the affidavit itself, and in particular the fact that the affiant allegedly had personal knowledge that the debt was valid, would effectively serve to validate the debt to the reader, whether that was Brent or a court.

Therefore, the affidavit was false, deceptive, and misleading in its use in conjunction with an attempt to collect a debt, and Midland and MCM have violated FDCPA § 1692e.

### 4.  Bona fide error defense

The FDCPA provides that a debt collector has an opportunity to show that a violation of the act was caused by mistake rather than mal intent.  "The bona fide error defense allows a debt collector who has violated some provision of the FDCPA to avoid liability by asserting an affirmative defense."  Shauna Cully Wagner, Annotation, *Construction and Application of Fair Debt Collection Practices Act (FDCPA) Bona Fide Error Defense, 15 U.S.C.A. § 1692k(c)*, 14 A.L.R. Fed. 2d 207 (2006).  Specifically, the act provides that:

A debt collector may not be held liable in any action brought under this subchapter if

the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

FDCPA § 1692k(c).  *See generally Jerman v. Carlisle, McNelka, Rini, Kramer & Ulrich CPA*, 538 F.3d 469, 472-73 (6th Cir. 2008).  The Sixth Circuit has clarified this, defining a three-part test:  "[t]o qualify for the bona fide error defense, a debt collector must prove by a preponderance of the evidence that: (1) the violation was unintentional; (2) the violation was a result of a bona fide error; and (3) the debt collector maintained procedures reasonably adapted to avoid any such error."  *Id.* at476-77.

The Sixth Circuit has allowed bona fide error defenses to the FDCPA based on the error either being clerical or being a mistake of law.  An example of a clerical error exists in *Lewis*, where a consumer had sent a letter to the debt collector insisting that the collector "cease further communications" with him, which is an option that the FDCPA provides.  *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 395 (6th Cir. 1998).  While the collector did cease most of its collection activities, one letter and one phone call went out after that point.  *Id.*  The Court allowed the bona fide error defense, finding that the phone call was due to the nature of the case going from the credit card company to the collector, back to the credit card company, then back to the collector.  *Id.* at 396-97.  On the final transfer it was put in the system as a new account and the consumer was called in spite of the fact that he had insisted on no communication.  *Id.*  An employee of the collector caught the fact that the account was put in as new and corrected it, but not before the phone call went out to the consumer.  *Id.*  The Court found "that [the debt collector's] manual and computer systems were 'reasonably adapted' to avoid the error that occurred in this case and in fact were able to catch the error in a very short period of time."  *Id.* at

16

401.  In evaluating whether the debt collector is free of intent and entitled to the bona fide defense, the Court found that the intent to make the phone call was not relevant; the intent to violate the FDCPA was the essential element.  *Id.* at 402.

In addition to clerical mistakes, the Sixth Circuit has also allowed the bona fide error defense for mistakes of law.  *Jerman*, 538 F.3d at 472-73.  The debt collector in *Jerman* sent a letter that included the statement that a dispute of the debt must be made "in writing."  *Id.* at 570.  In actuality, the FDCPA does not require debtors to make their disputes in written form.  *See* §1692g(a)(3) (requiring a debt collector to send the consumer "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector[.]")  The Court concluded that the FDCPA lacks any language that restricts errors to just those clerical in nature, and therefore errors involving mistakes of law qualify, as long as they meet the above test. *Jerman*, 538 F.3d at 476.

Midland and MCM claim that their violation was unintentional in that they relied on data from Citibank in good faith and relied on the law firm JBR "to independently evaluate the Brent account for suit."  (Doc. 41 at 25).  If the violation of the FDCPA was that the data from Citibank was faulty, these arguments could present a bona fide defense.  This, however, is clearly not the violation in question.  Brent alleged, and this Court finds, that Midland and MCM used false, deceptive, and misleading information not in rehashing various information acquired from Citibank, but in the statements in the affidavit of Mr. Jimenez which falsely claim that he had personal knowledge of the debt and the debtor, among other things.  *See supra.*

The affidavit form, called "Form 400" internally at Midland and MCM, was prepared by

17

in-house counsel and then populated with data that was obtained from Citibank.  In his deposition,

Brian Frary, in-house legal counsel for Midland and MCM, described the process of creating the

verbiage in the "Form 400" affidavit:

> Q    Who drafts forms like Form 400?
> A    These are a collaborative effort between in-house Midland legal staff and the firms themselves.
> Q    Did the Midland legal staff authorize the use of this specific form?
> A    Yes.

(Brian Frary Dep., Doc. 35 Ex. C at 60).

The bona fide error defense acts as an affirmative defense for the debt collector, requiring

"the debt collector [to show] by a preponderance of the evidence that the violation was not

intentional and resulted from a bona fide error . . ."  Midland and MCM have not so shown

anything leading the Court to believe the violation was a bona fide error.  They have provided

little or no explanation for how the mistake of preparing a form affidavit that asserts personal

knowledge on the part of an affiant who could not possibly have it could be without intent.  The

intent necessary, per *Lewis*, would need to be intent to violate the FDCPA by misleading, not just

intent to use that verbiage on the form.  However, as they have offered absolutely no legitimate

explanation (or any explanation) as to how these clearly false statements can appear on their

standard affidavit without the intent to mislead, the Court concludes that the act is intentional by

its very nature and not a bona fide error.

Further, when confronted with the challenge of showing that they have maintained

procedures reasonably adapted to avoid errors, Midland and MCM have completely failed to show

any procedure to avoid this error.  They detail how data is verified for accuracy when imported

from Citibank, but not how the language of the affidavit itself is so checked.  In *Jerman*, the debt

18

collector had "demonstrated that considerable time, effort and research were spent in evaluating the validity of the 'in writing' requirement. [The debt collector's] compliance officer regularly attended FDCPA seminars, examined and distributed relevant case law, regularly held meetings, and encouraged open discussion of FDCPA issues." *Jerman* 538 at 478.  Midland and MCM demonstrate absolutely no procedures they have in place to verify that the language claiming personal knowledge does not end up in their standard affidavit.

Thus, as Midland and MCM are unable to show that the error was unintentional, that the error was bona fide, and they had maintained procedures reasonably adapted to avoid the error, this Court finds that they are not entitled to a bona fide error defense.  As a result, Midland and MCM violated the FDCPA § 1692e by using a clearly false, deceptive, and misleading form affidavit in connection with the collection of a debt.

**B.  Violation of the FDCPA by attempting to charge an improper interest rate**

Brent asserts that Midland and MCM violated the FDCPA when they sent two dunning letters that listed the interest rate at 10%.  By statute, Ohio allows the collection of an interest rate agreed upon contractually, or, in the absence of that, a state-mandated maximum rate.  *See* Ohio Rev. Code 1343.03(A).  At the time in question, the state-mandated maximum rate would have been 8%.  However, Midland and MCM claim that this is not a valid FDCPA violation because: (1) Brent was time-barred from raising the issue about the interest rate since it was not in the original complaint;  (2) Brent first raised the §1692f claim in her motion for summary judgment; and (3) Midland and MCM were entitled to collect at 10% or higher based on a contractual relationship.

**1.  Time-barred from the interest rate claim**

19

Midland and MCM assert that Brent is time-barred from bringing the interest rate claim based on how the following events transpired:

·   On October 1, 2007, the last letter seeking 10% interest was mailed by MCM to Brent.

·   On November 28, 2007, the last auto-dialer phone call was made by MCM to what turned out to be an incorrect or out-of-date phone number for Brent.

·   On December 8, 2008 the Brent file was sent for possible litigation to JBR.

·   On April 17, 2008, Midland filed a complaint in the Sandusky, Ohio Municipal Court for the unpaid credit card balance.

·   On May 19, 2008, Brent filed her counterclaim alleging various violations of the FDCPA § 1692e.

·   On December 1, 2008, Brent filed an amended counterclaim that specifically indicated that the interest rate was a FDCPA violation.

It is clear that the violations of § 1692e are not time-barred, as they occurred less than one year before Brent filed her counterclaim, and she mentioned § 1692e in her original complaint. More complex, though, is whether Brent is time-barred from claiming a violation of § 1692f.  The Court shall consider the theories put forth by Brent: (1) that a full year had not passed since Midland and MCM were attempting to charge 10% until the complaint was amended, and (2) that the relation-back doctrine allows the modification.

Brent asserts that even though the last auto-dialer phone call was made on November 28, 2007, Midland and MCM were still trying to collect the debt until they referred the matter to JBR for possible litigation on December 8, 2007.  Midland and MCM assert that when the autodialer called on November 28, 2007, it was determined that that particular phone number was wrong,

and it never tried calling again. Therefore, the attempt to collect the debt at 10% ended on November 28, 2007.

On this issue, the Court finds that Midland and MCM's position is well taken. Every entry on the auto-dialer log shows no answer/no message left until November 28, 2007 when the number was identified as wrong. Shortly thereafter, the case was referred for litigation. Logically, Midland and MCM changed course after finding the bad number and no evidence has been presented to show that they made any attempt to collect the account at 10% thereafter.

However, a revised pleading can relate back to an original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading[.]" Fed. R. Civ. P. 15(c)(1)(B). The Sixth Circuit holds that the doctrine is "based on the notion that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence." *U.S. ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d. 493, 516 (6th Cir. 2007) (quoting *Brown v. Shaner*, 172 F.3d 927, 932 (6th Cir. 1997)); *accord Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000). "Thus, a court will permit a party to add even a new legal theory in an amended pleading as long as it arises out of the same transaction or occurrence." *Miller* 231 F.3d at 248. Even "[a]n amendment that alleges added events leading up to the same injury may relate back." *Id.* (quoting *Koon v. Lakeshore Contractors*, 128 F.R.D. 650, 653 (W.D.M.I., 1988). *See Tiller v. Atlantic Coast Line R. Co.*, 323 U.S. 574, 581 (1945).

Brent's initial complaint alleges a wide variety of violations of the FDCPA stemming from

Midland and MCM's effort to collect the debt from Brent.  The complaint uses some inclusive language, such as "[t]he acts and omissions of MCM and Midland violated the FDCPA, including, *but not limited to*: . . ." Doc. 2 at 8.  (emphasis added).  While this language could arguably be instructive, the Court focuses on whether the original allegations are from the same transaction and occurrence as the allegations in the modified complaint.  As dunning letters and phone calls are "events leading up to the . . . injury" that is alleged in the original complaint, this Court finds that the relation back doctrine applies.  *Miller* 231 F.3d at 248.  The attempt to collect the debt via a lawsuit was an extension of, and closely enough related to, the attempt to collect via the dunning letter that listed the interest rate to merit this finding.

### 2. §1692f claims first raised in the motion for summary judgment

Midland and MCM claim that Brent cannot first raise §1692f in its motion for summary judgment and they cite *Turner* in support.  *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784 (6th Cir. 2005).  *Turner* may be instructive, but is not directly on-point. In that case, the court found that a Plaintiff could not raise a new issue in a summary judgment response.  Brent seeks to raise the issue first in her motion for summary judgment, not in her response, and thus distinguishes her case.

The Sixth Circuit has not dealt directly with first raising issues via motions for summary judgment.  District courts and other circuits have reached mixed results.  Some courts have found that the key issue is whether the other party has sufficient notice of the claim and opportunity to defend against it.  The Southern District of Ohio recently found, for instance, that a plaintiff who was facing a defendant's motion for summary judgment could bring up a new and separate count as long as the defendant was well apprised of the situation.  *Spengler v. Worthington Cylinders*,

514 F.Supp.2d 1011, 1017 (S.D.O.H. 2007) (finding that "Although Spengler did not allege a

separate count of retaliatory discharge in violation of the ADEA, and although prudence and good

practice suggest that it is better to do so, Spengler's allegations were sufficient to apprise WC of

the claim").

However, other district courts and many circuits hold that issues cannot be first raised in

motions for summary judgment.  The Eight Circuit found that "[the plaintiff] attempts to expand

his claims in his brief, arguing that he was terminated for speaking in the summer session class in

May 2003.  Having not raised this fact in his Complaint, he cannot rely on it now." *Satcher v.*

*University of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009).  *See also*

*Gonzalez v. City of Federal Way*, 299 Fed.Appx. 708, 710 (9th Cir. 2008) (holding that "[t]he

district court properly refused to consider Gonzalez's First Amendment claim as the complaint did

not provide fair notice of this claim and it was raised for the first time on the summary judgment

motion.");  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir. 2000) (holding that

"[a]fter having focused on intentional discrimination in their complaint and during discovery, the

employees cannot turn around and surprise the company at the summary judgment stage on the

theory that an allegation of disparate treatment in the complaint is sufficient to encompass a

disparate impact theory of liability.").

The case at bar is not distinguishable from *Tucker* where the Sixth Circuit held that new

claims cannot be raised in summary judgment replies, even though Brent raised the new claim via

the motion for summary judgment not the reply.  The Court further agrees with holdings from the

Eighth and Ninth Circuits that issues cannot be first raised in motions for summary judgment.

Therefore, Brent's claims of violations of §1692f are raised too late and this Court finds in favor

of Midland and MCM on this issue.

However, this finding does not extinguish Brent's claims of a violation of the FDCPA by attempting to collect 10% interest.  Brent well pled these violations under §1692e in the amended counterclaim and this Court will evaluate these claims for summary judgment.

### 3.  Midland and MCM's right to collect interest

When Citibank sold the Brent debt to Midland, it supplied no interest rate and the Midland/MCM computer systems left it at "0."  At the dunning letter stage, Midland tried to collect at 10%, possibly erroneously thinking that this was the statutorily allowable rate.  (*See* Frary Deposition, Doc. 35, Ex. C at 30-31) (stating that interest rates are "reviewed periodically by the law department" and supplied to the IT department for population onto dunning letters).  Even though 10% exceeds the statutorily allowed rate of 8%, Midland and MCM now claim they may have been contractually allowed to collect at 17.4%, thus any action taken at 10% was allowable.

During discovery, Midland and MCM provided statements from Citibank, showing that Citibank was using 17.4% as the interest rate.  (Doc. 35, Ex. A).  Brent, however, disputes that she was under this particular agreement and questions the chain of ownership from the bank she did business with, Associates, to Midland and MCM.  Furthermore, Midland and MCM fail to provide enough evidence to conclusively prove that Citibank and its successors in interest are *entitled* to collect at 17.4%.

This Court finds that neither party has met its burden for summary judgment.  A genuine issue of material fact exists as to whether Midland and MCM were entitled to collect at 17.4%, and therefore not in violation of the FDCPA when they tried to collect at 10%.  As to this point,

24

therefore, summary judgment is denied to both parties.

## C. OCSPA § 1345

Brent alleges that the same acts that violate the FDCPA also violate the Ohio Consumer

Sales Protection Act ("OCSPA").  Ohio Rev. Code Ann. § 1345 *et seq.* (2008).  In order for this to

be true, the following elements must be present: (1) Midland and MCM must be considered

"suppliers" as defined by OCSPA; (2) Brent must be considered a "consumer" as defined by the

OCSPA; (3) the act of collecting the debt must be considered a "consumer transaction" as defined

by the OCSPA; and (4) the acts of Midand and MCM must be considered violations of the

OCSPA.  *See* § 1345.01 (Defining supplier, consumer, and consumer transaction); *see also* §

1345.02 ("No supplier shall commit an unfair or deceptive act or practice in connection with a

consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section

whether it occurs before, during, or after the transaction.")

### 1.  Whether Midland and MCM are "suppliers" under the OCSPA

District Courts in the Sixth Circuit have held that while transactions between financial

institutions and their customers are not covered by the OCSPA, debts purchased by debt collectors

*are* covered by the OCSPA:

> The OCSPA covers far more transactions, through its broad definition of "supplier,"
> than does the FDCPA. The Ohio Legislature specifically exempted financial
> institutions from this statute, likely in recognition of the fact that banks are heavily
> regulated by other statutes and codes.  A bank customer has other adequate remedies
> if a bank should engage in deceptive or unfair conduct in making a loan or issuing a
> credit card. But if the financial institution sells a past due or defaulted debt at a deep
> discount to an unrelated party, whose only business is debt collection, the sound policy
> for the financial institution exemption evaporates.

*Lee v. Javitch, Block & Rathbone, LLP*, 522 F.Supp.2d 945, 956 (S.D. Ohio 2007); *Lee v. Javitch,*

25

*Block & Rathbone, LLP*, 484 F.Supp.2d 816, 821 (S.D. Ohio 2007).  *See also Williams v. Javitch,*

*Block & Rathbone, LLP*, 480 F.Supp.2d 1016, 1024 (S.D. Ohio 2007) (holding that the Court

could not find any definitive authority that would exempt debt collectors as it exempts banks).

The same courts have distinguished cases where the original debt was not part of a

consumer transaction.  For instance, it found that "because the underlying contract between

Plaintiff and Direct Merchants falls outside the scope of a 'consumer transaction,' Defendant's

collection efforts in connection with that debt fall outside the purview of the OCSPA."  *Gionis v.*

*Javitch, Block & Rathbone*, 405 F.Supp.2d 856, 869 (S.D. Ohio 2005).  However, the more recent

opinions issued by the Southern District of Ohio move away from this distinction to simply calling

all debt collectors "suppliers."  *See Lee*, 522 F.Supp.2d 945; *Lee*, 484 F.Supp.2d 816; *Williams*,

480 F.Supp.2d 1016.

In 1984, the Ohio Court of Appeals ruled that debt collectors must be suppliers,

rationalizing that to fail to do so would entice the original suppliers to defeat the OCSPA by

quickly moving all debt to third party collectors.  *Celebrezze v. United Research, Inc.*, 19 Ohio

App.3d 49, 482 N.E.2d 1260 (1984).

Thus, the weight of the authority in both Federal District Courts and Ohio Courts view the

OCSPA's reach to debt collectors as appropriate where the debt collector is not otherwise

regulated as a bank.  Courts see the OCSPA as not creating a gap in consumer protection, and thus

protecting consumers against violations during the process of debt collection.  *See generally* Oh.

Consumer L. § 2:11 (West 2008).  This Court agrees.  For the purposes of the OCSPA, Midland

and MCM are suppliers.

**2.  Whether Brent is a "consumer" under the OCSPA**

Once Midland and MCM are considered suppliers by the OCSPA, Brent is logically considered a consumer.  The OCSPA defines consumers very simply as "a person who engages in a consumer transaction with a supplier."  § 1345.01 (D).  Thus, Brent is a consumer for the purpose of the OCSPA.

### 3.   Whether collecting a debt is a "consumer transaction" under the OCSPA

Logically, as courts have used the inclusive language of the OCSPA to consider debt collectors to be suppliers, they have also considered the act of collecting the debt to be a consumer transaction.  The OCSPA "prohibits a supplier of consumer goods from engaging in 'an unconscionable act or practice in connection with a consumer sales transaction . . . before, during, or after the transaction.'  Because the statute applies to acts or practices after a transaction has been completed, it may encompass debt collection."  *Smith v. A.B. Bonded Locksmith, Inc.*, 143 Ohio App.3d 321, 757 N.E.2d 1242 (2001).

Thus, the act of collecting a debt is considered a consumer transaction for the purposes of the OCSPA.

### 4.  Violations of OCSPA

The OCSPA prohibits "an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."  § 1345.02 (A).  As was discussed at length, *supra*, the use of the false affidavit was unfair and deceptive in nature.

Therefore, Midland and MCM have violated the OCSPA by using the affidavit.

Midland and MCM's use of an interest rate of 10% could be a violation of the OCSPA just as it could be a violation of the FDCPA if Midland and MCM did not have the right to collect at

17.4%.  The Court considers the question of whether Midland and MCM were entitled to 17.4%

an unresolved dispute of material fact, and does not grant summary judgment to either party as a

result.

### D.  Injunctive relief or declaratory judgment

The Sixth Circuit has yet to rule directly on the issue of whether injunctive relief and

declaratory judgment are appropriate under the FDCPA.  However, other circuits have dealt with

this issue and decided that the Act provides for only actual damages to private litigants.  For

instance, the Third Circuit found that "[t]he FDCPA contains no express provision for injunctive

or declaratory relief in private actions. . . . Most courts have found equitable relief unavailable

under the statute, at least with respect to private actions."  *Weiss v. Regal Collections*, 385 F.3d

337, 341 (3rd Cir. 2004).  *See also Crawford v. Equifax Payment Services, Inc.*, (holding that "all

private actions under the Fair Debt Collection Practices Act are for damages.").  This Court agrees

that declaratory and injunctive relief are not appropriate under the FDCPA.  Brent's request for

such is denied.

However, the OCSPA does provide for both declaratory judgment and injunctive relief in

the text of the legislation:  "[a]ny consumer may seek a declaratory judgment, an injunction, or

other appropriate relief against an act or practice that violates this chapter."  § 1345.09 (D).

Therefore, this Court grants Brent's request for both declaratory judgment and injunction

with respect to the issue of the false affidavit.  The Court hereby enjoins Midland and MCM from

using any affidavit with a material falsehood as a means of collecting a debt.

### V.  Conclusion

For the reasons stated herein, Midland and MCM's motion for summary judgment is denied. (Doc. 35).  Brent's motion for summary judgment is granted in part and denied in part. (Doc. 34).

Brent's motion is granted with regard to the following: (1) Midland and MCM violated the Fair Debt Collection Protection Act (FDCPA) by attempting to collect a debt with a false affidavit; (2)  Midland and MCM violated the Ohio Consumer Sales Protection Act (OCSPA) by attempting to collect a debt with a false affidavit; (3) Brent is entitled to declaratory judgment and injunctive relief for the violations of the OCSPA; and (4) Midland and MCM are enjoined under the OCSPA from using false affidavits as an attempt to collect debts.

Brent's motion is denied with regard to the following: (1) there is a question of material fact as to whether Midland and MCM violated the FDCPA by attempting to collect interest at a higher rate than allowed by law; (2) there is a question of material fact as to whether Midland and MCM violated the OCSPA by attempting to collect interest at a higher rate than allowed by law; and (3) Brent is not entitled to declaratory judgment or injunctive relief for the violations of the FDCPA.

IT IS SO ORDERED.

    s/ *David A. Katz*    
DAVID A. KATZ
U. S. DISTRICT JUDGE